Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>ESMELBY ESTEVEZ-CASTILLO,<br><br>              Defendant. | Criminal Action No. 22-0515 (ES)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

In this criminal action, Defendant Esmelby Estevez-Castillo was charged with conspiracy to distribute heroin and possession with intent to distribute heroin. (D.E. No. 24). Before the Court is Defendant's motion to suppress evidence/motion for a *Franks* hearing. (D.E. No. 51). Having considered the parties' submissions, and noting that there are no disputes of material fact, the Court decides the motion without oral argument. *See* Fed. R. Crim. P. 12(c); *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010). For the following reasons, the motion is **DENIED**.

**I.    BACKGROUND**

    **A.    Factual Background**

On August 2, 2022, Defendant was charged with conspiracy to distribute heroin in violation of 21 U.S.C. § 846 and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (D.E. No. 24). Defendant is currently released on bond. (D.E. No. 27). Defendant moves to suppress evidence seized as a result of searches of (i) two storage facility units and (ii) a parcel sent in the mail. The Court recounts the factual history relevant to each search and seizure in turn.

        **i.  Life Storage Units**

On December 3, 2020, law enforcement obtained a search warrant issued by the Honorable Michael A. Hammer, U.S.M.J., to search two "Life Storage" storage units (numbers 3214 and 3261) located in Englewood, New Jersey. (D.E. No. 43 at 9 & 14). The warrant affidavit contained the following factual allegations.

In or around January 2019, Ohio law enforcement "identified a series of parcels shipped through the U.S. Mail that bore an unusual arrangement of labels" (the "Parcel Profile") and "bore the same particular type of postage." (D.E. No. 51-2 ("LS Warrant App.") at 329–30).[1] This Parcel Profile had previously been seen on a parcel that was searched pursuant to a warrant and found to contain heroin (the "Ohio parcel"). (*Id.*).[2] Law enforcement database searches identified a post office in Northern New Jersey ("Post Office 1") where large bulk purchases of the particular type of postage found on the suspicious parcels had been made. (*Id.* at 330). Video surveillance footage showed that an individual (the "Purchaser") made the bulk purchases, totaling over $1,000 for each purchase. (*Id.*). The purchases additionally included the types of envelopes and labels associated with the Parcel Profile. (*Id.*).

An employee of Post Office 1 informed law enforcement that the Purchaser "had been driving a light-colored, newer-model sport utility vehicle ('SUV')." (*Id.*). Traffic camera video footage from on or about February 19, 2019, showed an individual entering a car matching that vehicle description, along with the SUV's partial license plate number. (*Id.*). Law enforcement

---

[1] Pin cites to Docket Entry Number 51-2 refer to the pagination automatically generated by the Court's electronic filing system.

[2] The Government has previously explained that the Ohio parcel bore a unique USPS tracking Label 400, a Priority Mail stamp, and a rectangular, Avery-type mailing label with delivery and return addresses. (D.E. No. 43 at 3). "USPS Label 400 tracking numbers are printed in packages of 10 sequential books of 50 wrapped in plastic cellophane, resulting in a total of 500 possible sequential tracking numbers at a time. Accordingly, a single-large volume mailer can be identified by analyzing sequenced tracking numbers associated with multiple parcels." (*Id.* at 4 n.2).

determined that "the SUV was likely a vehicle registered to" Defendant. (*Id.*). Subsequently, two employees of Post Office 1 identified Defendant as the Purchaser via his driver's license photograph. (*Id.*).

From in or about September 2019 through in or about July 2020, an undercover law enforcement agent ("UC") made nine purchases of heroin using the darknet[3] from a seller called "mybreakdownflow" and "mbdf." (*Id.* at 330–31). Each purchase was shipped and delivered to a law-enforcement-controlled address in New Jersey; each package's label arrangement matched the Parcel Profile; and each tested positive for heroin. (*Id.* at 331). During this time period, law enforcement observed Defendant on multiple occasions traveling from his residence in Paterson, New Jersey (the "Paterson Address") to Life Storage and then immediately to a post office. (*Id.*). On or about January 7, 2020, law enforcement observed Defendant driving from the Paterson Address to Life Storage, then leaving Life Storage and later exiting from a U.S. Post Office located in Englewood, New Jersey (the "Englewood Post Office"). (*Id.*). The same day, law enforcement found six parcels in the lobby drop slot of the Englewood Post Office, each bearing the same arrangement of labels as the Parcel Profile. (*Id.*) Law enforcement seized one of those parcels, which was addressed to a location in Williamsburg, Pennsylvania (the "Pennsylvania Parcel"). (*Id.*). After the addressee of the Pennsylvania Parcel consented to a search of the parcel, law enforcement found that it contained heroin. (*Id.* at 332).

On December 2, 2020, this Court issued a Complaint and Arrest Warrant for Defendant; he was arrested on or about December 3, 2020. (*Id.*). On or about December 3, 2020, law enforcement interviewed the manager of Life Storage (the "Manager"); the Manager identified a

---

[3] Defendant has previously explained that the darknet is "a computer network that uses the internet but can only be joined by people who have permission or who have the right software . . . ." (D.E. No. 41 at 4 n.1).

3

photograph of Defendant as the individual who rented one storage unit (Unit 3214, or "Unit 1") and who paid the rent for Unit 1 and another unit (Unit 3261, or "Unit 2")[4] each month in cash; the Manager provided documentation listing Defendant on the rental agreement for Unit 1. (*Id.*). The Manager consented to a sweep by a narcotics-detection canine ("Tino") of Life Storage's common areas. (*Id.* at 333). The affidavit states regarding Tino: "According to Tino's handler, New Jersey State Police Trooper Dave Wilkinson, Tino is a certified narcotics dog and was last certified on or about November 12, 2020." (*Id.* at 333). Tino alerted law enforcement to the presence of narcotics twice—at both the door to Unit 1 and the door to Unit 2. (*Id.*). The warrant affiant noted:

> Based on my training and experience, I am aware that those involved in the sale of controlled substances often use secure locations apart from their residences to store and package controlled substances. I am also aware, based on my training and experience, that narcotics traffickers often keep firearms and ammunition near or in locations where they store their controlled substances and paraphernalia.

(*Id.*).

On December 3, 2020, law enforcement conducted a search of the Life Storage units pursuant to Judge Hammer's issued warrant. In Unit 1, they allegedly found "pre-printed typed Avery labels bearing multiple different New Jersey business addresses; stacks [of] Flat-Rate Priority mail parcels; stacks of Label 400 tracking numbers; stacks of manilla envelopes; small Zip-lock baggies; a heat sealer and heat-sealable bags; hand-written ledgers; a scale; and a thumb drive containing a program that is used to access the dark web." (D.E. No. 43 at 14). In Unit 2, law enforcement allegedly found "stacks of empty Flat-Rate Priority mail parcels; stacks of Label 400 tracking numbers; stacks of manilla envelopes; small Zip-lock baggies; a heat sealer and heat-

---

[4] Unit 2 was officially rented to an individual named "Dima Sanchez." (LS Warrant App. at 332). The address listed for Sanchez on the rental agreement for the storage unit was a location in Pennsylvania that law enforcement observed Defendant visit. (*Id.* at 332–33).

sealable bags; hand-written ledgers; 'Food-Saver' brand heat sealed baggies; and approximately 500 grams of a powdery substance that was later confirmed to be heroin." (*Id.*).

### ii. The Pittman Parcels

On June 7, 2019, the Honorable Cathy L. Waldor, U.S.M.J., signed search warrants for two parcels bearing the Parcel Profile (the "Pittman Parcels"). (D.E. No. 43 at 6–7). These parcels originated from Northern New Jersey and were sent to an address in Pittman, New Jersey. (*Id.* at 6). Five parcels bearing the Parcel Profile had been delivered to that address previously. (*Id.*). The two Pittman Parcels were seized out of the mail stream before they could be delivered, in May 2019. (*Id.* at 7). On June 6, 2019, a narcotics detection canine named "Dutch" indicated the presence of narcotics in the Pittman Parcels. (*Id.*). A search pursuant to the warrants issued by Judge Waldor revealed that the Pittman Parcels contained heroin. (*Id.*).

### B. Procedural History

On August 2, 2022, Defendant was charged by indictment with conspiracy to distribute heroin in violation of 21 U.S.C. § 846 and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (D.E. No. 24). Defendant is currently released on bond. (D.E. No. 27). On April 13, 2023, Defendant filed a motion to suppress evidence seized as a result of law enforcement's warrantless searches of certain parcels seized by law enforcement.[5] (D.E. No. 41). On July 25, 2023, the Court denied Defendant's motion to suppress, finding that Defendant did not have a reasonable expectation of privacy in the parcels, which were put into the U.S. mail system without bearing his name or address. (D.E. No. 49 at 13 & 23). The Court allowed Defendant another opportunity to move to suppress evidence seized during the searches

---

[5] The Court referred to these parcels as the Pennsylvania, Hackensack and Bloomfield parcels. (D.E. No. 49 at 9). Neither the Hackensack nor Bloomfield parcels were described in either of the relevant warrant affidavits, and they are not relevant to the instant motion.

of the Life Storage units and Pittman Parcels, which were conducted pursuant to search warrants. (*Id.* at 13–14).

On August 22, 2023, Defendant filed a new motion to suppress, specifically addressing the searches of the Life Storage units and the Pittman Parcels. (D.E. No. 51 ("Def. Br.")). The Government filed an opposition (D.E. No. 53 ("Opp. Br.")), and Defendant replied (D.E. No. 54 ("Reply")). Defendant initially argued that the warrants issued for the search of the Life Storage units and one of the Pittman Parcels were deficient due to material misrepresentations in the warrant affidavits. (Def. Br. at 4–5). More specifically, Defendant argued that he was entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 155 (1978), because the warrant affidavits contained falsehoods and/or material omissions, as "[t]he Magistrates in both warrant applications were not supplied with any indicia of reliability [of the narcotics dogs] in the affidavits." (*Id.* at 7 & 12). Defendant alleges that the warrant affidavits, without the positive dog alerts, were deficient in probable cause, contending that the positive dog alerts were the "linchpin" of the evidence in the warrant affidavits. (Reply at 3). Defendant argues that "[t]he evidence of the placement of a stamp and return address label is weak and unquantified," suggesting only that "potential contraband might be in the parcel," and that "Tino's false positive reaction to one of the storage units was a failure and should be considered prima facie evidence of unreliability." (Def. Br. at 11 & 13).

However, Defendant conceded in his Reply that the Court's July 25, 2023, ruling that he did not have a reasonable expectation of privacy in the Pennsylvania, Hackensack and Bloomfield Parcels extended to the Pittman Parcel as well, and thus that he "lacks standing to object to the search of the Pitman Parcels." (Reply at 3). As such, the Court only considers Defendant's motion to suppress insofar as it relates to the search of the Life Storage units.

In opposition, the Government argues that "there is substantial evidence supporting the magistrate judge's probable cause finding" even without the canine alert. (Opp. Br. at 4 & 9). Further, the Government contends that Defendant is not entitled to a *Franks* hearing because he cannot demonstrate (i) a false statement or omission in the warrant affidavit that (ii) was necessary to probable cause. (*Id.* at 14–16). Finally, the Government argues that even if the warrant were deficient, "law enforcement reasonably relied on and executed the warrants on the Life Storage units in good faith," and thus the evidence is admissible under the good faith exception to the exclusionary rule. (*Id.* at 10).

Defendant also submitted an "expert report" concluding that "the use of the K9 teams in this case is unreliable." (D.E. No. 57 at 11). The Government responded to the report arguing that Defendant "still fails to make a substantial preliminary showing that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit or demonstrate that the false statement or omitted facts were necessary to the finding of probable cause." (D.E. No. 58 at 1). The Government also argues that the report "is irrelevant because the determination as to whether the affidavit contained sufficient probable cause, or that law enforcement relied on it in good faith, lies solely within the province of this Court and is not the subject of proper expert testimony." (Opp. Br. at 17).

For the following reasons, the Court finds that there was probable cause to support the issuance of a search warrant of the Life Storage units without the inclusion of the positive dog alert, and thus that Defendant is not entitled to a *Franks* hearing.

**II.  LEGAL STANDARD**

When a defendant challenges probable cause to support a warrant issued by a magistrate, he must overcome a high bar. "[T]he duty of a reviewing court is simply to ensure that the

magistrate had a 'substantial basis for . . . concluding' that probable cause existed." *United States v. Williams*, 3 F.3d 69, 72 (3d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)). Great deference is given to the magistrate's probable cause determination. *Id.* Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a heart set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). *Gates* defined this "fluid concept" as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Probable cause is analyzed under a "totality of the circumstances" approach. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001).

Under *Franks v Delaware*, 438 U.S. 154 (1978), a defendant is entitled to a hearing if he can "make a 'substantial preliminary showing' that false statements in [a warrant affidavit] were 'material to the finding of probable cause' and were made 'knowingly or with reckless disregard for the truth.'" *United States v. Stanford*, 75 F.4th 309, 313 (3d Cir. 2023). "A motion to suppress is granted if, at the hearing, the defendant establishes the same elements by a preponderance of the evidence." *United States v. Aviles*, 938 F.3d 503, 508 (3d Cir. 2019). While "*Franks* dealt only with misstatements," the Third Circuit has "applied the *Franks* test to situations where affiants have omitted information from the affidavit." *United States v. Frost*, 999 F.2d 737, 743 n.2 (3d Cir. 1993). Omissions and misstatements are material where "probable cause would have been lacking if they had not been made." *Id.* at 509. When information was omitted from an affidavit, the materiality analysis involves "reconstruct[ing] the affidavit, including the recklessly omitted information" and determining whether the warrant as reconstructed provides probable cause for the search. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 474 (3d Cir. 2016).

### III.  DISCUSSION

8

The falsehood that Defendant alleges exists within the applicable warrant affidavit, meriting him a *Franks* hearing, is explained by Defendant as:

> there was no indication of Tino's . . . accuracy record in the Affidavit. The only indication of reliability was the dog's certification. However, we know virtually nothing about the certification process because the discovery does not demonstrate what the process was. The Magistrate was not provided with an accurate and substantial basis for concluding probable cause to issue a search warrant.

(Def. Br. at 9). Putting aside the issue of whether Defendant has sufficiently argued that this is a falsehood—either directly or by omission—it is clear to this Court that this falsehood/omission was not material to the finding of probable cause. Say the drug-sniffing dog here, "Tino," did have a poor accuracy record or inadequate qualifications—something that Defendant alleges might be possible, but cannot evidence, as he alleges the Government has failed to provide him with sufficient documentation regarding Tino's history.[6] (Def. Br. at 6–7). Even if that were true, as detailed below, the other facts in the warrant affidavit are more than sufficient to establish probable cause without the positive dog alert, especially under the deferential standard this Court must apply to a magistrate's probable cause determination. *Cf. United States v. Hodges*, 3 F. App'x. 608, 610 (9th Cir. 2001) (determining that an incorrect statement about a narcotic detector dog's history was not material to probable cause as "the evidence presented to the magistrate judge supports probable cause without consideration of [the dog's] record of prior seizures").

The warrant affidavit here contained a great deal of information demonstrating "a fair probability that contraband or evidence of a crime" would be found in the Life Storage units.

---

[6] The Government asserts that "counsel has been provided with ample discovery regarding canine 'Tino's' training, certification history and reliability." (Opp. Br. at 15 n.5). Regardless, since the Court finds that the dog sniffs were not material to the finding of probable cause, the Court need not resolve any disputes regarding the reliability of Tino's training and history.

9

*Gates*, 462 U.S. 213, 232. The warrant affidavit asserted that law enforcement made nine purchases of heroin which were delivered in parcels bearing the suspicious Parcel Profile; that six parcels bearing the Parcel Profile, including one parcel found to contain heroin, were found in a post office drop slot just after Defendant visited that post office; that Defendant was identified as an individual who had purchased in bulk the postage type found on the suspicious parcels; that Defendant was observed multiple times traveling from his residence to Life Storage and then to a post office; and that Defendant was identified as renting Unit 1 and paying for Unit 2. (*See* LS Warrant App. at 329–31). Combined, all of these facts certainly supplied a "substantial basis" for the magistrate to conclude that there was a "fair probability" that contraband would be found in the Life Storage units. The dog sniff, and any issues with Tino's qualifications, are thus immaterial to the probable cause finding, and Defendant's request for a *Franks* hearing is without merit.

Defendant's only counterargument appears to be that if the Government did not need the dog alert to establish probable cause, they would never have used the dog to confirm the presence of the narcotics. The Court is not convinced. Extra caution in establishing probable cause does not mean the extra step taken was *necessary* to probable cause. Such a viewpoint would eviscerate the *Franks* analysis altogether. Defendant's argument is simply insufficient to demonstrate a lack of probable cause.

### IV.   CONCLUSION

Based on the foregoing, the Court **DENIES** Estevez-Castillo's motion to suppress evidence/motion for a *Franks* hearing. An appropriate Order follows.

Date: December 13, 2023

*/s/Esther Salas*
Esther Salas, U.S.D.J.